Thank you, your honor. Gaston Bebbi, appearing on behalf of the appellant Marco Amaral. This case involves a takedown maneuver by the San Diego Police Department during a political demonstration in San Diego. The pretext proffered for bringing Mr. Amaral to the ground and fracturing his clavicle and grinding his face into the pavement was a perceived attempt to punch a police officer. A notion that first raised some five hours after the actual incident, after Officer Williams was advised by a fellow officer that Mr. Amaral needed attention. The reason that's important is because the San Diego Police Department's own rules and regulations required Officer Williams to take certain steps at the time of the arrest when the suspect has suffered an injury. And the things that he was required to do and didn't do was, number one, advise Mr. Amaral why he was being arrested or detained, two, take photographs of all the injuries and write a report. He didn't do any of those things. Instead, what he did was he turned Mr. Amaral over to a fellow police officer for transport to the jail and gave the fellow police officer a reason for the detention or the arrest. That reason was not that Mr. Amaral was engaged in the serious activity, a felony, of assaulting a police officer. So five hours later, he comes up with this notion that Mr. Amaral is assaulting a police officer. The irony of that is that if you look at the video, and the video is hard to see, but if you look at the stills, what really happened is that Mr. Amaral is remonstrating with two police officers who are apprehending a citizen. While he is doing that, contrary to what Officer Williams testified to, the person we believe is Officer Armstrong comes from the rear of Mr. Amaral and pushes another citizen directly in front of him. Mr. Amaral reacts to that. He throws his hands up and tries to move back. So the irony is he's actually trying to avoid contact with a police officer when he's smashed to the ground. Counsel, can I just focus your attention, refocus your attention just a little bit? For purposes of my questions, I would like to just assume for a moment that a reasonable trier fact could conclude that excessive force was used. OK, let's just assume that for a moment. The district court granted summary judgment on that. The district court on its own disagreed with that and granted summary judgment on the merits on that. But the district court went on and also considered whether or not, for purposes of qualified immunity, whether or not the law was clearly established at the time of this incident. And in most of these qualified immunity cases these days, that becomes a critical issue. So could you tell me and give me with citations to the case law or cases that you best believe support the idea that the officers, if they had, you know, reasonably alert, competent officer, would have understood that what he was doing at that time would have violated, in this case, Mr. Amaral or somebody in Mr. Amaral's situation. Constitutional rights. I will do that. I think what the district court went wrong is that the test is not whether there's a case out there with identical facts. I think that the precedent placing the statutory or constitutional question beyond debate, as stated in this court's decision in NEHAT, is whether or not, you know, you've got an action that clearly shows that constitutional rights were violated. Excuse me. Could I ask a question, please? And it is the district court nowhere in its opinion suggests that there is a need for identical facts for there to be clearly established law. Does he? He doesn't state that. I think the effect of his ruling indicates that. What are the cases that you think are your best cases? Which are the ones that are most on point? Well, we have, for example, the case of Smith versus the city of Hemet, where the court held that at the time of the incident, the law was clearly established that it was unconstitutional to use non-deadly force where a person never attacked or even threatened to attack a police officer. Well, if that's the case, and we take the facts in the light most favorable to Mr. Amaral, that's exactly the case we have here. We don't have an individual threatening to attack or attacking a police officer. And non-deadly force is used, intermediate force is used to bring him to the ground while he's exercising a First Amendment right. And his First Amendment right in this case is his right to utter disagreement with what the police officers are doing. But Smith did not at all involve the kind of exigency or sudden approach by a police officer as we have here, did it? You had a more extended period of events from the arrival of police officers at the place where all of this took place. It was a domestic dispute, was it not? It was a domestic dispute, and there was a greater time lag. Isn't that important? Isn't the quick unfolding of events in the instant case very important to how we go about examining excessive force cases generally? I think what's more important is the options available to the police officer. Now, it's true that in our present case... I'm sorry, sir, I didn't understand what you said. Could you repeat that? The absence available to the police officer? Options. Options, okay. Thank you. Options available to the police officer. In this case, the police officer dismounted his bicycle and immediately began running towards Mr. Amaral from my reading of the video. He didn't yell at him. He had time to take other reasonable steps. Instead, he smashed both forearms into his back and drove him to the ground. This is a non-deadly force case, though, so is there any case suggesting in this court's jurisprudence or from the Supreme Court that there's an obligation to call out and provide a warning under these circumstances? Is there any case that suggests that there is a need in a non-deadly force case to consider some other application of force? Well, the cases that deal with that are generally the deadly force cases. And I agree with the court. That's what the cases hold that deal with deadly cases. However, I think that, you know, I'm not absolutely certain, but if we look at the cases on appeal, I would bet that the majority are deadly force cases where the issue is presented. However, you know, the other thing that we need to look at is not just the constitutional decisions, but also the department's own rules and regulations. And the department's own rules and regulations have a matrix, you know, for application of intermediate force, which is non-deadly force. And it states that the intermediate force application should be secondary to a warning or other less intrusive means of confronting the suspect, which was not done in this case. So, counsel, you pointed to Smith. Would you point to any other cases? I think Smith comes the closest to the language that we're looking for, but I don't have any other cases as we sit here today. Well, factually, isn't it at least arguable that Jackson is closer to your case than most cases? Now, of course, in that instance, the non-deadly force there that was used was concluded not to be excessive, but there you have a crowd, the arrival of officers, and the application of force. Isn't it a little closer, at least factually, than what Smith is? Well, arguably, you could make the argument I don't believe that. I mean, the Jackson case, if I recall correctly, is the one where the officer sprayed the plaintiff's hair with pepper spray. That's right. And then pushed her to the ground. Here you have a much more violent interaction with Mr. Amaral. Is it more violent? Or let me ask the question another way. Doesn't this court's own jurisprudence suggest that a tackle, at least in and of itself, is not excessive, if you can consider this a tackle? Well, a tackle in and of itself is a broad statement. A tackle in and of itself where there's danger to another officer would not be excessive. A tackle in and of itself where the person is resisting arrest or exhibiting violence towards the police officer, that would not be excessive. But a tackle to someone exercising his First Amendment right, who's not posing a danger to anyone, I think would be excessive. There's one fact. Well, I was just going to ask. Your time is running out. I just wanted to ask you to address one point. There was some, as I recall, concern that apparently the officer thought that Mr. Amaral had a fist, that he had clutched a fist. And that's what Armstrong observed at the time. Does that make a difference here? Well, it would make a difference if Mr. Amaral did clutch a fist, which I don't think that the evidence bears out. Mr. Amaral does not admit to clutching a fist. And the evidence shows, again, that the fist still relied on by the city and the officer shows that Mr. Amaral is moving back and reacting to Officer Armstrong and another citizen shooting in front of him. Well, the district court concluded after looking at the videos that it was undisputed that Amaral had a fist. What do you say to that? I say that the district court read it wrong. I think a reasonable jury could look at that and determine that Mr. Amaral was not making a fist. He's reacting to a body flying in front of him, and he's actually turning away, trying to avoid contact, and is actually looking at one point at the officer just before he's smashed to the ground, giving enough time for the officer to not crash into him and to utter a warning or take another less violent step to confront Mr. Amaral. Let's assume the district court was wrong that Mr. Amaral was not making a fist, he was not in a boxing stance, but Mr. Amaral has admitted, has he not, and agreed to certain facts, that there was an order to disperse. That he, in fact, was approaching an officer who was in the course of making an arrest at the time that Officer Williams arrived, and that he was moving in the direction of the officer who was making an arrest. Might that still not be a sufficient set of facts for Officer Williams to have reasonably believed that there was an assault of some kind about to occur on another police officer, or at least that the other police officer was about to be interfered with? No, and I'll take those points one at a time. The first one is that there was an order to disperse. It's not disputed that the initial orders to disperse occurred sometime, I think it's 20 minutes and 10 blocks away from where the incident actually occurred. There's absolutely no evidence that Mr. Amaral heard that order. He says, and he testified at the scene, he heard something to that effect, and he was only given one to two seconds to disperse. The officer that Mr. Amaral admitted approaching was Officer Cox, who had the subject on the ground, and he was the one that he was remonstrating with and exercising his First Amendment right, saying, stop, you're hurting that man. So this is a totally different scenario from the picture that Officer Williams has painted, where he is preparing to assault Officer Armstrong, who Mr. Amaral didn't even know was coming, because Officer Armstrong came from Mr. Amaral's blind side and pushed the suspect directly in front of him. So we have two different scenarios occurring here. There's never been an allegation that Mr. Amaral made a fist, stopped, or attempted to punch Officer Cox. I think Officer Cox testified in his deposition, and I think that was part of the record, that he never felt threatened by Mr. Amaral. So we've got two different scenarios going on here, and I think that the trial court may have been confused by the two different things happening almost simultaneously. So you're about a minute over time. I'll give you a couple minutes, nonetheless, for a rebuttal. And unless the panel has any more questions now, we'll turn to your opposing counsel. Thank you. Thank you. Thank you, Your Honors. May it please the court, Cetil Tejura here for Appellees, City of San Diego, and Officer Jeffrey Williams. This court should affirm the granting of summary judgment for the two issues that are currently before the court, that is, for the alleged excessive force and for the alleged wrongful arrest. First, starting with the alleged excessive force, Officer Williams is entitled to qualified immunity on both prongs of the qualified immunity analysis. And starting with the first prong, there are four, at least four, undisputed facts which would allow Officer Williams to be granted qualified immunity on that first prong. The first is that unlawful assembly and dispersal order, which, as Mr. Bebby pointed out, was first given approximately 20 minutes before the subject contact. Mr. Amaral testified that he heard that dispersal order approximately one minute before he observed people being arrested in that parking lot. He heard that order. He testified he heard that order. It's an undisputed and, in fact, a stipulated fact. Could you clarify one thing on that? Did they keep repeating it? I thought the record showed that it was given 20 minutes earlier before the incident in the parking lot. It was first given 20 minutes earlier in front of the federal courthouse. And Mr. Amaral testified that he heard it at that intersection 11th and C approximately 18 to 20 minutes later. Did they keep repeating it? Yes. Oh, I see. And with respect to the record that's before the court, Mr. Amaral testified that that's where he heard it. That's when he heard it, approximately a minute before he observes people being arrested in the parking lot. But the second undisputed fact is that rather than disperse, rather than heed that order, he chose to go into that parking lot where officers are making arrests or attempting to make arrests. He chose to violate that order. It is undisputed that he was not just walking. He wasn't walking with his hands up, chanting. The record before this court, and it's undisputed that he's moving fast. In fact, he's moving at a speed of approximately two steps per second. And it's undisputed that at one point he crouches down, he has one leg in front of the other, and his hand, his right hand goes from fingers extended to a fist. That is undisputed. Let me ask you about that. I'm sure we've all watched the video, and I'm eager to hear from you as to how we're to approach the video or what, I don't want to use the word wait, but just how we should consider it. But when you say it's undisputed, the district court, in its opinion, says that plaintiff testifies he does not recall forming a fist while in the parking lot. Just from my own point of view, I'm not sure the district court got that right. And having read the deposition transcript, the portion in the appendix, Mr. Amaral was asked, do you recall balling your hand into a fist at any point in the parking lot? And his recollection is no, not at all. Now, is that response fairly taken as no, I don't recall, or no, I didn't ball my hand into a fist? It seems to me that it could be reasonably taken, at least on the face of a cold deposition transcript, either way. Wouldn't you agree? No, Your Honor, the question was very clear. Do you recall he said no? And actually, if you look at the next page of the excerpt of the record, there was an instance where I asked the question, do you recall something else? And he said, no, I don't recall. That, in fact, didn't happen. Mr. Amaral, at the time of his deposition, or even in an errata, could have affirmatively said, I never did it. He didn't do that. All right, but that was not the language he used. Let's assume that the reading of the deposition answer is as I've suggested. Just assume that hypothetically. Do you still have enough in terms of the facts that are stipulated to and that can be reasonably seen from the record, as well as what the reasonable perceptions of Officer Williams would have been to make a case to support a grant of qualified immunity here? Yes, Your Honor. Let's start with the Officer Williams testimony was, I observed his hand in a fist. Now we see in the video his hand in the fist. I understand that the video- Well, I looked at the video, and I had a hard time seeing whether or not there was a fist. This is a clear- I did, too. I'll be real honest with you. We slowed it down to 30 percent, whatever it is. We took it down as far as we could, and I looked for the fist. And I'm real honest with you. I didn't see a fist. These body-worn camera videos record approximately 30 frames per second, so it's very hard to see. I saw it. And the reason that I put the still frame photos in the brief is because when you look at it frame by frame, you can see it. You can see hands extended, hands in a fist. Where are his fingers? You can't see them in that second photograph that's in the brief. That doesn't necessarily mean they're in a fist, though, does it? They're in a fist from Officer Williams' point of view. Well, that's the way you perceived it. I perceived it that way as well. I looked at the still, and I thought, is this an individual who has an issue where he has no fingers or his hand is in a fist? You can clearly see that his hand is moved. It's moving very fast. And this is a clear example of how these situations that sometimes officers are presented with are fast and evolving. Let's assume, again, just for argument, that it's not in a fist, but that it's raised. Doesn't that still help you or help him in terms of the qualified immunity analysis in terms of what Officer Williams reasonably observed here and how he appreciated what he observed? It actually does, Your Honor. Even if it wasn't in a fist, if we assume that, he's going towards an officer at a high speed, two steps per second. He's moving, right? Mr. Amaral is moving towards the officer. Just moving towards the officer, does that warrant a takedown that occurred here? Yes, Your Honor. Just moving that way? Moving in the way— Without saying anything, just boom, down you go. The way that he's doing it, because we have to look at the totality of those circumstances. There's been a dispersal order. He was not allowed to be in that parking lot. There has been no First Amendment claim raised in this complaint. There is no First Amendment issue. There's no issue before this court of whether or not the dispersal order was a valid dispersal order. It's accepted that this was a valid dispersal order that he chose to ignore. He's going into the parking lot, approaching an officer from behind. And why does he approach him? Look to the stipulation of facts. Doesn't he admit? Doesn't he state that he was really going to advocate? He does, Your Honor. However, the reason why he's going there is not a material fact that prevents summary judgment from being granted. I'm not suggesting that it prevents it. My suggestion is that he's moving toward an officer in the course of effecting an arrest. The lawfulness or lack of lawfulness, Mr. Amaral probably doesn't know one way or another. But he's moving in that direction for the purpose of interceding in some way. Absolutely. And that is one of the crimes that relates to the second point before this court. He's certainly, at least with reasonable suspicion and probable cause from Officer Williams' point of view, he's about to interfere in a lawful arrest or what Officer Williams perceives as to be a lawful arrest. Mr. Amaral interjected himself into this parking lot. And the way he did it, from Officer Williams' point of view, was not in a peaceful, demonstrative, trying to advocate for someone he doesn't know, but he's doing it in a manner which, from Officer Williams' point of view, appears to be that he's about to assault or even batter an officer. So Officer Williams does what he must do, is to prevent that battery. And he did it with a minimal amount of force. He didn't use a baton, although he could have. He didn't use a teaser, although he could have. He didn't use a gun, which I don't think he could have. Why couldn't he just say stop? Well, Your Honor, remember that all of the testimony in this case, and as you can see from the videos, is very loud. So if he were to yell stop, there's no evidence in the record that anything different would have happened, that Mr. Amaral would have stopped or that these officers— Well, we don't know. We don't know. We don't know. Was it too difficult to argue? This was a fast-evolving situation. This happened in a matter of split seconds. Mr. Amaral is approaching the officer, and Officer Williams is on his bike. He needs to get off his bike and stop this assault. He needs to stop this battery from happening, which is what he does. Stop? We don't know. We don't know if that would have had any effect. This court's jurisprudence, and I'm looking at the Oro case in particular, states that warnings aren't required when less than deadly force is employed. So he wasn't under any kind of legal requirement to give a warning or to shout out something under these circumstances, to use less than deadly force.  That's correct, Your Honor. There's no case law that's been cited by the appellant or that's before this court that says that an order must be given. We are here to second-guess the officer, and we shouldn't. We should remember to review the facts in the light most favorable to the plaintiff, yet we still look at the point of view of the officer. It is undisputed, and to go back to the video, it's undisputed. There's no facts. There's no facts on the appellant's side that suggest that Mr. Amaral did not put his hand in a fist or that was not approaching the officer at a high speed from behind. That is undisputed. He had the opportunity to make changes to his deposition testimony. He had the opportunity to submit declarations when opposing the summary judgment motion. He didn't. It is an undisputed fact of the way that Mr. Amaral was approaching the officer from behind. And the fourth undisputed fact, which can allow this court to affirm qualified immunity on that first prong, is that it's undisputed that it was a controlled maneuver to take him to the ground. It was an intermediate use of force to prevent assaultive behavior. That amount of use of force, according to the San Diego's policy, which Mr. Bebe mentioned, could also be used just for active resistance, but this was more than active resistance. This is more than just violating the order in this case, but it would have been appropriate, even if this court somehow finds that there was an assault. How was he resisting? He violated the order. He went into the parking lot, and after being told and hearing, he in fact testified that he heard that there was an unlawful assembly order. That's not resisting arrest, right? I mean, what you're saying is that he, in response to Judge Baez's question, which how was he resisting, he wasn't resisting arrest, was he? He was violating a desist order, a dispersal order, right? Yes, and arguably violating the desist order when you're told if you don't leave you will be arrested is in fact could be considered active resistance. That's a very generous read of resisting. Thank you, Your Honor. Turning to the second prong of the qualified immunity analysis, there is no controlling precedent that has been cited by the appellant that would have put the Officer Williams on notice that his actions could have violated Mr. Amaral's constitutional rights. Smith v. Hemet is distinguishable factually in at least four different ways. The first being that there was no exigency in Smith as there was here. We see in the video that things were happening very fast. Mr. Amaral is moving towards the officer at two steps per half second. The second was the force, the takedown that was in Smith was used after pepper spray was administered. So we've got different levels of force involved. The third is that in Smith there were multiple officers that were trying to arrest the suspect and take control of the suspect. And here it's only Officer Williams that is making contact with Mr. Amaral. And fourth, in Smith, the suspect was slammed against a wall and then taken to the ground. That's very different than the controlled maneuver that we have here that Officer Williams used on Mr. Amaral. There simply is no binding precedent from this jurisdiction that would have put Officer Williams on notice. Counsel, we're frequently advised, admonished, if you will, by the Supreme Court not to define the right that is at stake at too generalized a level. So how should this panel go about setting out what the right is? And as part of that question, did the district court do so correctly in how it set out the inquiry about whether clearly established law prohibited Williams from using the degree of force that he did in the specific circumstances that he confronted? I think that the district court got it right. With respect to this case and the right here, we have a suspect who is approaching an officer at a high speed. Whether this court sees the fist or not, his hand is raised. His right hand is raised. And that, in this fast-evolving situation where he's approaching an officer from behind who's making an arrest, that's when they take down the speech. Let me ask just on that approach. Everybody characterizes his stance as a boxer's stance with one foot in front of the other. Was he paused for a moment? He did pause. Why do you call it a boxer's stance? The way that Officer Williams described it in his deposition. How does one walk in that kind of position? It's like a monster walk, right? From what we can see in the video is that he's running towards the group. An officer runs in front of him. He does pause for a minute, but then he continues running again. And that's when we have the two steps per half second. Now, he's not running with his hand. He's not running in an upright position. But he's crouched down. And it's hard because there's a lectern right here, but he's crouched down. His knees are bent. One foot's in front of the other. And now we've got one hand, his right hand, raised. And he's in that position going two steps. And I think Officer Williams testified that he was just a few feet from Officer Armstrong. Not Officer Cox, Officer Armstrong, who's an officer in front of him. With Officer Armstrong's back to him. So that's why Officer Williams described it as a boxer's stance. We, in me not being familiar with fighting, I call it a fighting stance is what I perceived it to be. But Officer Williams called it a boxer's stance. But you'd have to stop for a fighting stance, wouldn't you? You could still, I believe, still throw a punch while running. It's a stance. It's a stance. Yeah. We do have one foot in front of the other, though. That's what we see. But, again, let's assume hypothetically there's no fist, there's no boxing stance. Does that defeat the quality immunity claim here? No, Your Honor. No. On the second prong, there still is no constitutional precedent that would have put Officer Williams on notice that his action of a takedown. Because we can't define it as a high level of generality. We understand that there's never going to be a case exactly on point. But it needs to put the issue beyond constitutional debate. Smith v. Hemet just doesn't do it. None of the precedent from outside this jurisdiction puts him on notice. What do you say about Judge Smith's race, Jackson, and there are other cases that kind of fall in that line as well. Yeah. Jackson probably is similar. And in that case, the court found that the force was not excessive. And that involved pepper spray. Nelson, and there was Gravelette Blondin. Oh, which one was that? I apologize. Gravelette Blondin is the one where the – that was the fellow who was a little bit suicidal? And then the neighbors came out? I think that was close. That was very similar to Smith v. Hemet. I don't think – I think the facts are so distinguishable that it cannot – could not have placed Officer Williams on notice. How about Jackson? Jackson did – would not have either. The force was different in that case. We had a pepper spray, and then we had someone who then was taken to the ground. In this case, it simply wouldn't have put him – or could have put him on notice. It's factually distinguishable. Okay. All right. So if there are no other questions, we've taken you beyond your time. Thank you. Thank you for your argument. We'll give Mr. Bebby a few minutes in rebuttal. Thank you, Your Honor. There is another case. It's Young v. County of Los Angeles, where the court said the principle that it is unreasonable to use significant force against a suspect who is suspected of a minor crime, pose no apparent threat to officer safety, and could be found not to have resisted arrest, was well established in 2001. I think where the biggest confusion arises is that there are two police officers that are involved in – well, there are actually more, but the two major police officers are Officer Armstrong and Officer Cox. Mr. Amaral does move into the area to remonstrate with Officer Cox, and he testified in his deposition that it was never his intent to do anything other than to point out to this officer verbally that he was using excessive force, in Mr. Amaral's opinion. At some point, he stops. He stops when Officer Armstrong pushes his citizen in front of him, and he reacts and puts his hands up to get out of the way, not to hit anyone or not to get into a boxer stance or to make a fist. Now, you know, I probably made a fist about five times here. I'm not threatening to hit anyone. For a fleeting second – I'm a few thousand miles away, so I'm not concerned at all. Okay. But the point is that, you know, we have to take the incidents one at a time. The incident with Officer Cox is when he runs in and is advocating. At some point in time, that's interrupted by Officer Armstrong and his citizen rushing in front of him. Mr. Amaral tries to avoid contact with that individual, and that's the individual that Officer Williams claims is the object of the perceived assault and battery. It just simply isn't true, and a jury can find in favor of my client if given the opportunity. All right. Thank you. And that's all I have. Thank you very much. Thank you both for your arguments this morning. They were helpful.
judges: PAEZ, UNKNOWN, BADE